**REPUBLICAN PARTY OF the STATE OF CONNECTICUT, Lowell P. Weicker, Jr., Stewart B. McKinney, Nancy L. Johnson and Thomas J. D'Amore, Jr., Plaintiffs-Appellees,**

v.

**Julia H. TASHJIAN, Secretary of the State of the State of Connecticut, Defendant-Appellant.**

No. 1165, Docket 85–7011.

United States Court of Appeals, Second Circuit.

Argued May 16, 1985.

Decided Aug. 8, 1985.

Elliot F. Gerson, Deputy Atty. Gen., Hartford, Conn. (Joseph I. Lieberman, Atty. Gen. of Connecticut, Barney Lapp, Daniel R. Schaefer, Henry S. Cohn, Asst. Attys. Gen., Hartford, Conn., of counsel), for defendant-appellant.

Stanley A. Twardy, Jr., Silver, Golub & Sandak, Stamford, Conn. (David S. Golub, Stamford, Conn., of counsel), Ralph G. Elliot, Tyler, Cooper & Alcorn, Hartford, Conn., for plaintiffs-appellees.

Stephen E. Gottlieb, Albany Law School, Albany, N.Y., for amici curiae, political scientists.

James A. Wade, Robinson & Cole, Hartford, Conn., for amicus curiae, Democratic Party of the State of Conn.

Martin Margulies, University of Bridgeport School of Law, Bridgeport, Conn. and Martha Stone, Connecticut Civil Liberties Union Foundation, Hartford, Conn., for amicus curiae, Connecticut Civil Liberties Union.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Fascinated by the penchant of Americans to band together and gather strength from association, Alexis de Tocqueville wrote:

> The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures, and of acting in common with them. The right of association therefore appears to me almost as inalienable in its nature as the

right of personal liberty. No legislator can attack it without impairing the foundations of society.

A. de Tocqueville, 2 *Democracy in America* 203 (Bradley, ed. 1954).

It is this ability and propensity of our citizenry to unite and pursue desired goals that form the foundation of American political thought. Indeed, the very existence of this nation stands as a testament to the efficacy of political organization.

The bundle of freedoms bestowed by the first amendment, often perceived as safeguarding the individual from the will of the group, also serves to protect the group against the tyranny of the state. Having just emerged from an impassioned struggle for independence, the framers appreciated that effective political change could best be achieved through collective activities, and further recognized that the right to associate for political purposes was a natural concomitant of the right to espouse political views.

If our system of government is to remain responsive to the will of the people—as it must—the untrammeled freedom to join together in pursuit of political goals must be secured against state intrusion, and our political organizations must retain the freedom to invite into their ranks those citizens with whom they wish to associate.

Mindful of these tenets, we are called upon today to reconcile the tension between a political party's right to self-determination and a state's interest in regulating primary elections. Specifically, we are faced with a challenge by the Republican Party of the State of Connecticut against a state law that prohibits individuals with whom the party members wish to associate from participating in the party's primary. The district court, 599 F.Supp. 1228, held that the state-mandated closed primary substantially interfered with Republican Party's right of political association by determining who is eligible to participate in the Party's candidate selection process. In addition, the court concluded that the interests proffered by Connecticut to support its state regulation were not compelling. For the reasons set forth below, we affirm the judgment of the district court.

Because the legal issues presented in this appeal are framed, to a large extent, by reference to political exigencies, we believe it would prove helpful to set forth the significant aspects of Connecticut's electoral scheme.

## I. BACKGROUND

### A. *Connecticut's Primary Election System*

Pursuant to Connecticut law, potential candidates for electoral office are divided into three categories: those representing "major parties," those of "minor parties," and independents (or "petitioning parties").[1] By virtue of its performance in past gubernatorial elections, the Republican Party is a major party. As such, its candidates are automatically accorded space on the general election ballot, while other candidates may have their names placed on the ballot only after fulfilling the petition requirements set forth in §§ 9–453a through 9–453u.[2] Conn.Gen.Stat. § 9–379.

---

**1.** A "major party" is one (a) whose candidate in the preceding gubernatorial election received at least twenty percent of the total votes for that office, or (b) whose candidate for the office in question received, at the last preceding regular election for that office, at least ten per cent of the total votes. Conn.Gen.Stat. § 9–372(5)(A). A "minor party" is one whose gubernatorial candidate received less than twenty percent of the total vote in the preceding election, and whose candidate for the office in question received less than ten percent, but at least one percent of the total vote for that office in the preceding election. Id. § 9–372(6). Indepen-

dents, or "petitioning parties," are candidates or parties that have qualified for nomination for elective office pursuant to the provisions of §§ 9–453a through 9–453u inclusive, or in instances of nominations for vacancy elections for the offices of state senator or state representative, as provided in § 9–216.

**2.** Minor parties nominate candidates in a manner prescribed by the party's own rules, which must be filed with the Secretary of the State. Conn.Gen.Stat. §§ 9–452, 9–453. Candidates not nominated by a major or minor party may still appear on the ballot by presenting the Sec-

In 1955, the Connecticut General Assembly enacted a "challenge" primary law, codified as Conn.Gen.Stat. §§ 9–372 *et seq.*, which authorizes each major party to select candidates to be nominated for electoral office. Party endorsements are made at state or district conventions, and only enrolled party members may vote to select those delegates who attend the convention. *Id.* §§ 9–387, 9–390, 9–407. If a candidate is not opposed at the convention, he becomes the party's nominee in the general election and no primary election is held. *Id.* §§ 9–408, 9–409. A candidate rejected by the convention, however, is eligible to challenge the endorsed candidate in a primary election if he has received on any roll call convention vote at least twenty percent of the votes of the delegates present and voting, and files a document with the Secretary of the State certifying that he has garnered the requisite vote total. *Id.* § 9–400. Party primaries are held at the expense of the State, and the primaries for all major political parties in Connecticut are held on the same day, during the same hours and at the same polling places. Separate voting machines are used for each party on primary day.

Mindful of these aspects of Connecticut's primary election apparatus, we turn to the voting eligibility requirements, which constitute the crux of the instant appeal. Section 9–431 of the Connecticut General Statutes provides, in pertinent part:

No person shall be permitted to vote at a primary of a party unless he is on the last-completed enrollment list of such

party in the municipality or voting district. . . .

To enroll in a political party, a person must execute an application for enrollment form, requiring him to state his name, address, desired party affiliation, previous party affiliations within the past six months and the date on which he applied to remove his name from the membership list of the political party with which he was previously affiliated. Party enrollment lists are a matter of public record, *Id.* § 9–55, and Connecticut does not require lists of unaffiliated voters to be available at the polls on primary day. Connecticut Public Act 84–118, which became effective on January 1, 1985, allows an unaffiliated voter to participate in a party's primary election if he enrolls in that party prior to twelve o'clock noon on the last business day before the primary. *Id.* §§ 9–56, 9–57. Finally, a voter enrolled in a party may at any time apply to have his name removed from that party's enrollment list, and to transfer to the enrollment list of another party. He may not, however, vote in any primary for six months following the date of his application for transfer. *Id.* § 9–59.

B. *The Republican Party's Challenge to Section 9–431*

The Connecticut Republican Party (the "Party") is comprised of individuals who associate for the common advancement of political beliefs and ideas. Its ultimate goal, as stated in the preamble to its Constitution,[3] is to "seek out, designate, and

---

retary of the State with a petition bearing signatures equal to one percent of the votes cast for the same office at the preceding election. *Id.* § 9–453d.

**3.** The Preamble to the Convention and Committee Rules of the Republican Party of the State of Connecticut provides as follows:

Among the goals of the Republican Party of Connecticut are to seek out, designate, and secure the election of qualified candidates for public office at the Federal, State and Local levels of government. The Republican Party believes in each individual's dignity, ability to solve his or her own problems with minimal governmental interference and support,

sound fiscal policies which will provide opportunity for all of our citizens.

The Republican Party of Connecticut stands, as it always has, open to all interested persons and offers to them equal opportunities of participation without regard to race, color, creed, sex or national origin.

In its stance as a statewide political organization, dedicated to governmental improvement on all levels, the Republican Party of Connecticut encourages fullest voter participation in its activities and supports the broadest possible membership registration.

To achieve the goal of governmental improvement, the Republican Party of Connecticut solicits the ideas, the interest and the participation of all segments—our young peo-

secure the election of qualified candidates for public office at the Federal, State and Local levels of government," who will implement its policies, philosophies and programs. Correlative to this objective, the Party seeks to nominate those candidates who enjoy the broadest spectrum of popular support and, therefore, appear most likely to obtain electoral success at the polls.

In recent years, however, the Republican Party has been thwarted in its quest for electoral success. A contributing factor to its repeated November failures may be that there are far more registered Democrats than Republicans in Connecticut. Recent party registration figures underscore the magnitude of this disparity. At the time this action was commenced,[4] Connecticut had 659,268 registered Democrats, 425,695 registered Republicans, and 532,723 registered but unaffiliated voters.

Animated by the Democratic Party's statistical hegemony, and keenly aware of Connecticut's untapped reservoir of unaffiliated voters, the Republican Party's State Central Committee in August 1983 established a subcommittee to study the Party's existing rules, and devise a strategy to improve the Party's chances for future electoral success. After analyzing the Party's electoral plight, the subcommittee concluded that allowing unaffiliated voters to participate in Republican Party primaries

would increase the Party's chances of winning general elections, ensure the nomination of candidates with greater bipartisan support, broaden the involvement of unaffiliated voters in the electoral process and strengthen the two-party system. To measure the support of this proposal among the Party's rank and file, State Republican Chairman Thomas D'Amore called a state party convention to consider, *inter alia*, "proposed changes [in party rules] to allow unaffiliated voters to vote in Republican Party candidate selection primaries."

On January 14, 1984, delegates to the State Republican convention approved an amendment to the party rules permitting unaffiliated individuals to vote in Republican Party primaries for the offices of United States Senator, United States Representative, Governor and the gubernatorial "underticket."[5] Specifically, the Party Rule provided:

> Any elector enrolled as a member of the Republican Party and any elector not enrolled as a member of a party shall be eligible to vote in primaries for nomination of candidates for the offices of United States Senator, United States Representative, Governor, Lieutenant Governor, Secretary of the State, Attorney General, Comptroller and Treasurer.

Because the Party Rule was in direct conflict with Section 9–431, which prohibits

---

ple, our seniors, businessmen and labor. Only by this means can the Republican Party adequately reflect the interests of all the people and work on their behalf. And to this end, the Republican Party is dedicated.

The Republican Party of Connecticut is further pledged, in the interests of fuller voter participation, to conduct its business in public. All party meetings at all levels shall be conducted after sufficient advance notice and in such public places as to invite citizen observation.

The Republican Party's rules of operation are designed and followed to afford all members equal opportunity to take part in party affairs, to run for public or party office, and to serve as delegates to party conventions on all levels—local, district, state or national.

The Republican Party of Connecticut believes in a fully informed membership and a fully informed citizenry; for it is only when

all people completely know and understand our goals that we will be able to achieve them.

**4.** Presently in Connecticut there are 718,772 registered Democrats, 608,613 registered but unaffiliated voters, and 477,749 registered Republicans. *The Hartford Courant*, Jan. 4, 1985 at A6. Not surprisingly, the Republican Party has experienced little electoral success in recent years. In fact, since 1958, the Republican Party has captured only four of sixteen statewide elections for Governor and United States Senator. During this same period, the Party was victorious in only 25 of the 84 elections for United States Representative. *See* State of Connecticut Register and Manual 72–82 (1983); 42 Cong.Q. 2923 (Nov. 10, 1984).

**5.** The Rule would not affect voter qualifications in other Republican Party primary elections, including those for seats in the Connecticut Senate and House of Representatives.

unaffiliated voters from voting in any party primary, Republican legislators sought to amend Section 9–431 during the 1984 session of the Connecticut General Assembly. To this end, in February 1984 State Representative Mae Schmidle introduced Bill No. 5525 (the "Schmidle Bill"), which provided in relevant part:

> EXCEPT WHERE PROVIDED OTHERWISE BY STATE PARTY RULES, no person shall be permitted to vote at a primary of a party unless he is on the last-completed enrollment list of such party in the municipality or voting district. . . .

The Schmidle Bill was referred to the Committee on Governmental Administration and Elections, where debate focused on the practical difficulties that would accompany implementation of the provisions of the Bill. On February 28, 1984, Albert Lenge, Director and Elections Attorney in the Office of the Secretary of the State, appeared before the Committee and testified that implementation of the Party Rule would be "workable." Despite Lenge's testimony, the Schmidle Bill fell prey to fierce Democratic opposition in the General Assembly.[6]

Undaunted by the demise of the Schmidle Bill, Republican legislators sought alternate means to implement the Party Rule. Specifically, they drafted two amendments to Bill No. 5105, "An Act Concerning the Time Limit for Enrollment of Unaffiliated Voters." The amendments provided that:

> Where state party rules so provide, an elector whose name does not appear on any enrollment list shall be entitled to vote in a primary conducted by such party for nomination for election to the office of governor, lieutenant governor, secretary of the state, treasurer, comptroller, attorney general, senator or representative.

On April 11, 1984, both amendments were defeated decisively in the House, and the increasingly partisan tenor of this issue was manifest in the recorded vote.[7] One week later, a similar partisan struggle ensued on the floor of the Connecticut Senate. There, all twenty-three Senate Democrats voted against an amendment incorporating the provisions of the Schmidle Bill; all thirteen Republicans voted in support.

## C. The District Court Proceedings

Frustrated in its efforts to implement the Party Rule through legislation, the Republican Party turned its attention to the judiciary. On May 10, 1984, the Republican Party of the State of Connecticut[8] filed a complaint in the United States District Court for the District of Connecticut, seek-

---

**6.** On March 7, 1984, the Committee on Governmental Administration and Elections voted 13 to 8 against the Schmidle Bill. The Committee further voted 12 to 9 against reporting the bill out of Committee with an unfavorable report, thereby preventing the proposed legislation from being considered by the entire General Assembly. On March 15, the Committee reconsidered its earlier vote and reported unfavorably on the bill to the House of Representatives, indicating the Committee's opposition. Burdened with an unfavorable report, the bill languished in the House and was never presented for a vote.

**7.** At the time of the vote, there were 87 Democrats and 63 Republicans in the Connecticut House of Representatives. One amendment was defeated by a vote of 92 to 54; all 83 Democrats voted against the bill and none in its favor. The second amendment was defeated by a vote of 93 to 54, with 85 Democrats voting against the bill and none in favor, and 8 Republicans voting against the bill and 54 in favor. Indeed, on June 28, 1985, Connecticut Governor William A. O'Neill, a Democrat, upheld his promise to veto any legislation that would enable the Republican Party to implement its rule. *See The Hartford Courant,* Jan. 4, 1985 at 1. After Senate Bill No. 5, Public Act No. 85–320, which would have permitted unaffiliated voters to participate in certain primary elections, was passed by both houses of the Connecticut legislature, Governor O'Neill vetoed the bill.

**8.** The other named plaintiffs were the Chairman of the Republican State Central Committee, Thomas J. D'Amore, Jr., and the Connecticut Republican Party's principal federal elected officials—United States Senator Lowell P. Weicker, Jr. and United States Representatives Stewart R. McKinney and Nancy L. Johnson. Named as defendant was Julia H. Tashjian, Connecticut's Secretary of the State, who is responsible for administering Section 9–431.

ing to enjoin the enforcement of Section 9–431 of the Connecticut General Statutes as unconstitutional.

The Party asserted that Section 9–431 substantially infringed its first amendment right to associate for the advancement of common political objectives. Accordingly, it maintained that the statute could be upheld only if it was necessary to advance compelling state interests and only if it advanced those interests in the manner least restrictive of the ability of the Republican Party to structure its candidate selection process as it deems appropriate. In response, the State of Connecticut claimed that Section 9–431 only incidentally burdened the Republican Party's right of political association and that the statute advanced legitimate state interests. In addition, Connecticut contended that the proposed Party Rule violated Article I, section 2, clause 1 of, and the seventeenth amendment to, the United States Constitution by permitting unaffiliated voters to participate in primary elections for congressional offices, while denying them an opportunity to vote in primary elections for seats in the State legislature.

On July 13, 1984, the Republican Party moved for summary judgment pursuant to Fed.R.Civ.P. 56. Two days later, Connecticut moved to dismiss the Republican Party's complaint, pursuant to Fed.R.Civ.P. 12(b)(6).[9] After examining the Joint Statement of Facts and Joint Submission of Documents prepared by the parties, reviewing the extensive materials submitted by the *amici curiae*[10] and conducting an evidentiary hearing, Judge Cabranes denied both motions, finding a number of disputed factual issues. The parties then conducted

further discovery and prepared a Supplemental Joint Statement of Facts, which was submitted to the district court on July 24. That same day, Connecticut renewed its motion to dismiss, and on the following day, the Republican Party again moved for summary judgment.

On December 5, 1984, Judge Cabranes granted the Republican Party's motion for summary judgment, and denied Connecticut's motion to dismiss. The court concluded that Section 9–431 "substantially impinges" on the Republican Party's first amendment right of political association by allowing the Connecticut legislature to "substitute its judgment for that of the party on ... the question of who is and (who) is not sufficiently allied in interest with the party to warrant inclusion in its candidate selection process." Subjecting Section 9–431 to "strict judicial scrutiny," the district court found that the interests proffered by Connecticut to support its mandated closed primary—avoiding voter confusion, preventing raiding, and preserving the integrity of the electoral process— were not compelling.

In addition, Judge Cabranes concluded that the Republican Party Rule did not violate Article I, section 2, clause 1 or the seventeenth amendment of the United States Constitution. Those provisions were intended to "dissuad[e] states from capriciously restricting the franchise in congressional elections." The district court found that the Party Rule would "open[ ] the political process by including greater numbers of voters in congressional primaries" and would further "the democratic values underlying Article I, section 2."

---

**9.** Because Connecticut supplemented its Rule 12(b)(6) motion with affidavits and documentary evidence that were accepted by the district court, Judge Cabranes properly treated the motion as one for summary judgment. Rule 12(b)(6) requires that, when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *See Eklof Marine Corp. v. United States,* 762 F.2d 200, 202 (2d Cir.1985).

**10.** Because of the far-reaching implications of this case for primary elections in particular and the two-party system in general, and the benefits to be derived from the presentation of divergent ideological and political viewpoints, the district court invited a variety of interested persons and organizations to participate as *amici curiae.* Among the *amici* were the American Civil Liberties Union, the Connecticut Civil Liberties Union, as well as a number of prominent law professors and political scientists.

Accordingly, Judge Cabranes permanently enjoined enforcement of Section 9-431 "as applied to the Republican Party Rule." The State of Connecticut timely filed a notice of appeal.

## II. Article I, § 2 and the Seventeenth Amendment

Before addressing the principal issues raised by this appeal, we dispose of the State's claim that the Party Rule is foreclosed by Article I, § 2 of, and the seventeenth amendment to, the United States Constitution. The Party Rule permits unaffiliated voters to participate in primaries for United States Representatives and Senators, while denying them the corresponding opportunity to vote in primaries for state representatives. According to the State, Article I, § 2 and the seventeenth amendment require "absolute symmetry" between federal and state voter eligibility requirements—as applied to primary elections—within a particular state.[11] Concomitantly, it asserts that the order of the district court—which implicitly validated the Party's "open-primary" rule—must be vacated. We disagree.

A careful examination of Article I, § 2, cl. 1 [12] reveals that the clause is comprised of two distinct and severable provisions. The initial phrase, "The House of Representatives shall be composed of Members chosen every second Year by the People," reflects the Framers' desire to establish in at least one legislative branch a representative democracy directly accountable to the state citizenry. *See* J. Story, *The Constitution,* § 573 at 422–423 (5th ed. 1891).

**11.** Connecticut maintains that the Party's Rule is unconstitutional because the qualifications sections of Article I, § 2 and the seventeenth amendment do not permit federal voter qualifications to be more generous than state qualifications. In accordance with this view, Connecticut asserts that neither Congress nor the state legislatures are authorized to set federal voter qualifications, and that the qualifications for electors of Congress are wholly borrowed from the various state qualifications for voting for state representatives. Under this view, eligibility to vote for United States Representatives and Senators would merely track the underlying State's preexisting system. In support of its position, Connecticut cites the Supreme Court's description of the workings of the qualifications provision set forth in *Ex Parte Yarbrough,* 110 U.S. 651, 663, 4 S.Ct. 152, 158, 28 L.Ed. 274 (1884):

> The States in prescribing the qualifications of voters for the most numerous branch of their own legislatures, do not do this with reference to the election for members of Congress. Nor can they prescribe the qualification for voters for those *eo nomine.* They define who are to vote for the popular branch of their own legislature, and the Constitution of the United States says the same persons shall vote for members of Congress in that State. It adopts the qualification thus furnished as the qualification of its own electors for members of Congress.

*See also Katzenbach v. Morgan,* 384 U.S. 641, 647, 86 S.Ct. 1717, 1721, 16 L.Ed.2d 828 (1966).

The Party, on the other hand, argues that Art. I, § 2 and the seventeenth amendment should be interpreted consistent with the intentions that animated the Framers' inclusion of the qualifications language—a compromise provision permitting suffrage to be determined by reference to state law, but insuring that the states could not establish stricter voting requirements for the selection of federal representatives than they had for state legislators. Essentially, we are urged to hold that a state's qualifications merely set the minimum standard by which federal voter requirements in that state must be measured, rather than determine the only acceptable standard. An electoral scheme that establishes a broader franchise for federal elections than state races would, therefore, be perfectly permissible.

Because we hold that the qualifications sections of Article I, § 2 and the seventeenth amendment are not applicable to primaries, we, unlike our concurring colleague, find it unnecessary to reach this question.

**12.** Article I, § 2, cl. 1 provides:

> The House of Representatives shall be composed of Members chosen every second Year by the People of the several states, and the Electors, in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

The seventeenth amendment, calling for the popular election of Senators, was styled after Article I, § 2. It provides, in pertinent part:

> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

Accordingly, the two sections share a common interpretation. *See Phillips v. Rockefeller,* 435 F.2d 976, 979 (2d Cir.1971).

The language, "chosen ... by the people," has been interpreted to create in favor of a class of qualified voters a constitutionally protected "right" to participate in the selection of representatives, as well as a protection against interference with the privileges of suffrage—including the expectation that one's vote will be counted. *See, e.g., United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

The concluding portion, "and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature," unlike the preceding language, has not been subject to intense judicial scrutiny. Because this language constitutes the core of the State's position, determining its intended place within the federal electoral scheme will ultimately lead to the resolution of this issue.

An inquiry into the events surrounding the adoption of the qualifications clause reveals that its inclusion in Article I, § 2 was the result of compromise at the Federal Convention of 1787. Before approving this language, the Framers entertained various proposals aimed at devising a uniform national standard for the selection of House members. These proposals were rejected, largely because the Framers foresaw great resentment by the people of those States that had adopted broader principles of suffrage than might be accepted under a national scheme.[13] The Framers, however, declined to leave the determination of federal voting eligibility solely to the states' unfettered discretion. It was feared that absent some constitutional prohibition state legislatures would seek to involve themselves in the selection of House members. By tying federal suffrage rights to what was presumably the most generous state standard—voting eligibility requirements for "the most numerous Branch of the State Legislature"—the Framers sought to insure that the goal of direct participation by the people of each state, rather than the legislatures, would be achieved. Article I, § 2 must, therefore, be properly understood as a compromise between state and federal interests.[14]

The State of Connecticut unqualifiedly asserts that "there can be no question" but that Article I, § 2 and the seventeenth amendment apply to primaries. In so doing the state relies principally on the Supreme Court's decision in *Classic, supra.* In that case, the United States prosecuted certain Louisiana Commissioners of Elections for allegedly falsifying ballot returns in a Democratic primary for the House of Representatives. The statutes pursuant to which the Commissioners were charged forbade the abridgement of any "rights, privileges and immunities secured and protected by the Constitution and laws of the United States."

In reversing a judgment sustaining a demurrer to the indictment, the Court held that by allegedly altering and falsely counting primary ballots, the election officials had deprived Louisiana residents of their

---

**13.** Indeed, several members of the Convention suggested that this controversy, though relatively insignificant in comparison to the undeniably monumental features of the document, might even threaten ratification. Most notable among the proponents of state determined qualifications was Oliver Elseworth, who we observe with the enchantment of historical coincidence was Connecticut's representative. He is said to have opined:

> The right of suffrage was a tender point, and strongly guarded by most of the State Constitutions. The people will not readily subscribe to the National Constitution if it should suggest them to be disfranchised. The states are the best judges of the circumstances and temper of their own people.

J. Madison, *Journal of the Federal Convention,* at 468 (1970).

**14.** The Federalist's comments on the nature of this accommodation is particularly instructive:

> The provision made by the convention appears to be the best that lay within their option. It must be satisfactory to every State, because it is conformable to the standard already established by the State itself. It will be safe to the United States, because being fixed by the State constitutions, it is not alterable by the State governments, and it cannot be feared that the people of the States will alter this part of their constitutions in such a manner as to abridge the rights secured them by the Federal Constitution.

*The Federalist No. 52,* (J. Cooke ed. 1961).

"right to choose at a primary election, a candidate for election as representative ..." *Id.* at 315, 61 S.Ct. at 1037. Acknowledging that the framers of the Constitution had not contemplated the "elimination of candidates for Congress by the direct primary" procedure, the Court nevertheless concluded that a right to participate in such primaries was "embraced in the right to choose representatives secured by Article I, § 2." *Id.* at 315–16, 61 S.Ct. at 1037–38.

If the freedom of choice secured by Article I, § 2's command, "The House of Representatives shall be composed of Members chosen ... by the People," was to be meaningfully protected, the Court reasoned that freedom must exist at every level of the selection process. The Court stated:

> Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, ... this right of participation is protected just as is the right to vote at the election ...

*Id.* at 318, 61 S.Ct. at 1039.

In *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the Court invoked *Classic* in holding that the fifteenth amendment's ban on infringement of the "right to vote" based on race extended to party conventions as well as general elections.

Contrary to the State's assertions, we do not find *Classic* and its progeny control the question before us. As we previously noted, Article I, § 2, cl. 1 contains two distinct provisions concerning suffrage in congressional elections. The opening reference to members "chosen ... by the people,"—like the fifteenth amendment's protection of the "right to vote"—recognizes a substantive right of participation in representative democracy. *Classic* and *Allwright*'s extension of that right to include suffrage in party primaries was considered necessary to assure the vitality of that privilege in twentieth century American politics. We note, however, that at no point in either opinion was the qualifications section of the clause even discussed. That language, which was not connected to "chosen by the people" in a earlier draft of Article I, § 2 [15] and constitutes a separate sentence in the seventeenth amendment, speaks only to the mechanics of voting and was intended as a procedural safeguard to ensure the right of the people to select members of Congress without interference from the state legislatures.

■ Viewing the question as one of first impression, we decline to interpret the term "Electors" in Article I, § 2 and the seventeenth amendment to include participants for party primaries. We observe that a system of selecting candidates for federal office by party primary is permitted rather than dictated by the Constitution. The source of this power, Article I, § 4,[16] grants broad authority to the States to "provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932); *cf. Buckley v. Valeo*, 424 U.S. 1, 13 n. 16, 96 S.Ct. 612, 632 n. 16, 46 L.Ed.2d 659 (1976).

Significantly, Article I, § 4 does not command that the regulation of congressional elections comport with procedures employed in administering state elections. Theoretically, then, a state might choose to institute preferential ballot access based on direct primaries for state offices, but leave federal elections to a single vote of the

---

**15.** In an earlier version of the Constitution, Article I, § 2 read as follows:

> The members of the House of Representatives shall be chosen every second year, by the people of the several States comprehended within this Union. The qualifications of the electors shall be the same from time to time, as those of the electors in the several states, of the most numerous branch of their own Legislatures.

**16.** Article I, § 4 provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

electorate. If an electoral scheme that completely excluded the use of primaries in congressional elections would be permissible, then the Republican Party's rule cannot be said to violate the Constitution simply because it seeks to establish state and federal nominating procedures that differ only with respect to voter qualifications.

Moreover, unlike the situation in *Classic* where a narrow reading of the Constitution would have effectively defeated one of the purposes underlying the text, the concern that prompted the qualifications provision—that a state might unilaterally disenfranchise citizens from the selection of federal legislators—would not be implicated. Article I, § 4 would allow Congress to override state procedure by directing the establishment of preferential ballot access in congressional races.

Finally, we note that an interpretation of the term "Electors" encompassing persons who participate in a primary would go well beyond simply expanding the reach of the qualifications provision to include the candidate selection stage—essentially the result achieved in *Classic* and *Allwright.* By contrast, the State's proposed interpretation would require that we recognize a separate class of electors and qualifications for each party's primary. Qualified Republicans would thus be distinct from qualified Democrats. Such a multidefinitional approach is clearly at odds with the Framers' singular and nonpartisan view of voting qualifications. We are reluctant to embrace such a radical and counterintuitive reading of the qualifications provision.[17]

Accordingly, we hold that the primary eligibility requirements at issue are not subject to the qualifications provisions of Article I, § 2 and the seventeenth amendment. Because we find no constitutional impediment to the enjoining of Section 9–431, and the resultant enforcement of the Republican Party's "open primary" rule, we turn now to the essence of this appeal.

### III. The Right of Association

In the main, the Republican Party asserts that Section 9–431 substantially interferes with its right of political association by determining who is eligible to participate in its candidate selection process. Before examining in detail the substance of the Republican Party's claim, we believe it is helpful to trace the origins of the right of association and delineate its historical contours. As shall be seen, the right of association has venerable roots, but only recently has it received the imprimatur of the judiciary and been afforded constitutional protection.

### A. The Origins of the Right of Association

From time immemorial, societies have been compelled to grapple with an individual's sense of anomie. Although each political order has adopted individuated solutions, every such effort—whether the Greek polis or the Roman civitas—has embraced the concept of association as a buffer between the individual and the state.

The history of American political thought reveals that the significance of voluntary association antedates the drafting of our Constitution. Before our ties with England were severed in 1776, Committees of Correspondence were established to provide "speedy and direct channels" for communication and enable the people to "understand their interests and act in concert," and become effective "arbiters of their own political destiny." H.R.Doc. No. 702, 57th Cong., 1st Sess. 245 (1902). There existed a variety of other nongovernmental organizations and associations that were "close to the people" and satisfied the myriad needs of our infant Republic. *See* R. Wood, *The Creation of the American Republic,* 186–96, 319–28 (1969); *The Federalist No. 56* (J. Madison).

---

**17.** Such an analytical framework might also at times produce anomolous results. Under the "absolute symmetry" theory, for example, a party seeking to nominate candidates only for federal office would find itself without any qualified voters because none of its members would have qualified to participate in a primary for state representatives.

The importance of political association was fortified by and memorialized in the Constitution, which included provisions explicitly designed to protect political opposition, and accorded independent vitality by the First Congress, which expressly included the rights of free speech, assembly and petition in the text of the first amendment. Moreover, in the *Federalist Papers*, James Madison extolled voluntary private association as maximizing the opportunities for self-realization, and minimizing the dangers attendant to centralized power. *See The Federalist No. 10*, 57 (J. Cooke ed. 1961). The Madisonian link between freedom of association and "true" democracy became embedded in Western political thought, and was expressed eloquently by de Tocqueville:

> In their political associations the Americans, of all conditions, minds, and ages, daily acquire a general taste for association and grow accustomed to the use of it. There they meet together in large numbers, they converse, they listen to one another, and they are mutually stimulated to all sorts of undertakings. They afterwards transfer to civil life the notions they have thus acquired and make them subservient to a thousand purposes. Thus it is by the enjoyment of a dangerous freedom that the Americans learn the act of rendering the dangers of freedom less formidable.

*Democracy in America, supra,* at 129.

The democracy envisioned by Madison and marvelled at by de Tocqueville, however, bears little resemblance to the realities that today prevail. The structure of American society has undergone a vast metamorphosis in the past two centuries. No longer is the individual the basic political or economic unit and, largely for that reason, the concept of eighteenth century democracy fails to explain the dynamics of our current socio-political system. In recent years, organizations—political, social and economic—have become the primary repositories of power. Like all liberties, the right of association must be defined, to a large extent, by reference to the contours of the existing socio-political landscape.

A corollary of our society's penchant for organization is that the association has achieved a prominence that could hardly have been imagined two centuries ago.[18] Indeed by the middle of this century, the voluntary association had become one of the linchpins of our democratic process. Yet, it had not been afforded constitutional protection in its own right.[19]

B. *The Constitutional Right of Association*

Although the constitutional text does not mention freedom of association, the Supreme Court, in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), recognized an independent right of association. Such a right, according to the Court, derives from the first amendment guarantees of speech, press, assembly and petition. The issue before the Court was whether an Alabama statute requiring compulsory disclosure of membership in the NAACP imposed "the likelihood of a substantial restraint upon the exercise by [the NAACP's] members of their right to freedom of association." *Id.* at 462, 78 S.Ct. at 1172.

Of even greater importance than the unanimous holding that the NAACP could not be compelled to deliver to the Alabama Attorney General the names and addresses

---

**18.** The rise of the association has paralleled the development of democratic self-confidence and the increasing complexity of social, economic and political life. In the words of Arthur Schlesinger, the association has "restored a sense of self-importance bruised by the anonymity of life amidst great crowds." A. Schlesinger, *The Rise of the City* 288–90 (1939).

**19.** The Court did, however, recognize a variety of quasi-associational activities essential to associational expression as falling within the realm of first amendment protection. Among these hybrid associational forms accorded first amendment protection was the holding of a public meeting, *see De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937), parade, *see Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), demonstration, *see Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

of its members and agents in the State of Alabama was the reasoning relied on by the Court in reaching that result. The Court implicitly bifurcated associational rights into their individual and collective components. In examining the individualistic aspect, the Court "recognized the vital relationship between freedom to associate and privacy in one's associations," and declared that the constitutional prohibition against mandatory identification of supporters is especially robust where the group espouses dissident beliefs. *Id.*

The principles announced in *NAACP v. Alabama* have been reaffirmed consistently as courts continue to protect the individualistic component of freedom of association not only against direct attack, but also against inroads by the insidious interference that often follows public identification with a controversial organization. In sustaining a constitutional challenge to another coerced disclosure of NAACP membership lists, for instance, the Supreme Court reasoned that the government's action represented a substantial encroachment upon an individual's right of privacy of association. *See Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

More recently, in *Roberts v. United States Jaycees,* —— U.S. ——, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Court expounded upon the meaning of the individual component of freedom of association. Writing for the majority, Justice Brennan noted that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* 104 S.Ct. at 3249. Freedom of association, therefore, is to be protected

as a fundamental component of our personal liberty.[20] Consistent with this interpretation, the Court has accorded constitutional protection to that select group of intimate relationships and bonds that cultivate shared ideals and beliefs. *See Zablocki v. Redhail,* 434 U.S. 374, 383–86, 98 S.Ct. 673, 679–81, 54 L.Ed.2d 618 (1978) (marriage); *Smith v. Organization of Foster Families,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977) (raising and educating children); *Moore v. City of East Cleveland,* 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (cohabitation with relatives).[21] It has also been held that an individual enjoys the right to associate with the candidate of his choice. *See Buckley v. Valeo, supra.* This individual association may be manifested by contributing money to, or working for, the candidate's campaign, or supporting the candidate in the election.

By contrast to the fertile development of the individualistic aspect of associational rights, the collective component, also conceived in *NAACP v. Alabama,* remains largely nascent. In that case, the Court referred to the ability of NAACP "members to pursue their collective effort to foster beliefs," 357 U.S. at 463, 78 S.Ct. at 1172. In addition, the Court evinced a concern with an association's ability to advocate the beliefs of its members and recognized that an association may be able to realize objectives that differ qualitatively from those attainable by individuals.

The right to speak, petition or assemble would be hollow indeed if the corresponding freedom to engage in group effort toward those ends was not accorded independent constitutional protection. Because of this nation's abiding commitment to pluralism, and our candid recognition that the

20. The emotional enrichment individuals draw from their affiliations with others, and the overriding tendency of individuals to frame their identity by reference to a particular group, provide the foundations upon which the individual component is premised. *See* Emerson, *Freedom of Association and Freedom of Expression,* 74 Yale L.J. 1, 4 (1964).

21. These relationships share a variety of common elements, including their relative smallness, the intensity of the affiliation, the depth of the commitment and the commonality of beliefs and ideals. As such, affiliations with these characteristics implicate an individual's personal liberty and should be presumed to possess the requisite intimacy to warrant protection under the individual right of association rubric.

sum of an association may often be far greater than its individual parts, courts have been particularly hesitant to countenance any governmental intrusion—either direct or indirect—into the core of expressive group effort. Whether the government seeks to withhold benefits from individuals because of their membership in a group or association, *see Healy v. James*, 408 U.S. 169, 180–84, 92 S.Ct. 2338, 2345–48, 33 L.Ed.2d 266 (1972); compel disclosure of an individual's membership in a group seeking anonymity, *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 91–92, 103 S.Ct. 416, 419–420, 74 L.Ed.2d 250 (1982); or interfere with the internal organization or affairs of the association, *see Cousins v. Wigoda*, 419 U.S. 477, 487–88, 95 S.Ct. 541, 547–48, 42 L.Ed.2d 595 (1975); such interference with the right of collective association may be justified only by narrowly drawn regulations that serve compelling state interests. For, as Justice O'Connor stated in her concurring opinion in *Roberts v. United States Jaycees, supra*, such state regulation "will necessarily affect, change, dilute, or silence one collective voice that would otherwise be heard." 104 S.Ct. at 3259.

## C. *The Right of Political Association*

 Freedom of association confers a right to join with others to pursue activities independently protected by the first amendment. Because political advocacy and participation in partisan politics are lodged at the heart of the first amendment, freedom of association necessarily includes a right of political association. Concomitantly, freedom of association protects the right to form a political party for the advancement of partisan political beliefs.

Although the genesis of the constitutional right of political association may be traced to *NAACP v. Alabama*, its maturation occurred more than one decade later when, in a series of decisions, the Court transformed political association from abstract theory into an effective right.

In *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the American Independent Party challenged Ohio's ballot regulations, which would have barred George Wallace, the Party's candidate from inclusion on the 1968 presidential ballot. Pursuant to Ohio law, new parties were required to file nominating petitions signed by a number of registered voters equal to at least fifteen percent of the total state vote in the last gubernatorial election. For a candidate to have his name placed on the November general election ballot, these petitions were required to be filed in February. Although the American Independent Party satisfied the numerical requirement by collecting 450,000 signatures, it did not file its petition by the February deadline. The Supreme Court concluded that the statutory electoral scheme, which effectively limited the ballot to two major parties, placed a substantial burden on the right of individuals to associate for the advancement of political ideas.[22] As Justice Black reflected at the outset of his opinion for the majority, "[t]he State of Ohio ... has made it virtually impossible for a new political party, even though it has hundreds of thousands of members ... to be placed on the state ballot." *Id.* at 24, 89 S.Ct. at 7. Indeed, the *Williams* Court intimated that a statutory regime denying a group the fruits of their association—political impact—runs afoul of the first amendment no less than one precluding association itself. *See* L. Tribe, *American Constitutional Law* 779 (1978). Subjecting the Ohio regulations to strict scrutiny, the Court found that none of the interests proffered by Ohio to justify its ballot access restrictions was compelling.

Five years later, in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), the Court rejected a challenge to a New York statute that conditioned eligibility to vote in a primary on a declaration of affiliation made eight to eleven months prior to the primary election. The Court noted that the petitioners—who were eligible

---

**22.** The Court also invoked the strict scrutiny standard of equal protection review because it found a burden placed on the right of voters to cast their ballots effectively.

to register and to declare their party affiliation before the cutoff date, but who did not do so until the deadline had passed—were indeed excluded from the party with which they identified. Their associational rights were not infringed, according to the Court, because their disenfranchisement was the result of their "own failure to take timely steps to effect their enrollment." *Id.* at 758, 93 S.Ct. at 1250. Accordingly, the Court subjected the New York statute to only minimal scrutiny and readily found a legitimate state interest in preventing party raiding.

That same Term, in *Kusper v. Pontikes*, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973), the Court again expatiated upon the right of political association, and struck down as unconstitutional an Illinois statute preventing persons from voting in a party primary if they had participated in the primary of another party within the preceding twenty-three months. The Court found that the petitioner, who had voted in a 1971 Republican primary, was wed to that party by the Illinois statute although she no longer wished to be identified with it. "Unlike the petitioners in *Rosario*, whose disenfranchisement was caused by their own failure to take timely measures to enroll," the Court noted "there was no action that Mrs. Pontikes could have taken to make herself eligible to vote in the 1972 Democratic primary." *Kusper, supra*, 414 U.S. at 60, 94 S.Ct. at 309. Focusing on the individual associational component, the Court concluded that by "locking her in," the Illinois statute substantially infringed her right to associate "effectively with the [political] party of her choice," *id.* at 58, 94 S.Ct. at 308, and could be upheld only if it were shown to be necessary to further a compelling state interest that could not be achieved by a less restrictive means. Examining the Illinois durational affiliation statute in light of this standard, the Court had little difficulty concluding that it did not represent the least restrictive means of preventing raiding and preserving the integrity of the electoral process.

In 1978, the right of political association enjoyed by a party and its adherents was rearticulated and bolstered in *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). There, as in the instant case, the Court was called upon to harmonize the discord existing between state law and party rules. At issue was a ruling by an Illinois appellate court upholding an order that prevented the 1972 Democratic convention from replacing certain delegates elected in conformity with Illinois law but in violation of a Democratic Party rule. The Court reversed, reasoning that the injunction served no compelling state interest and that the state lacked sufficient justification to intrude so extensively into the associational rights of party members. Although the *ratio decidendi* of the case was that a state possesses a meager interest in preserving the integrity of a national nominating convention, the Court's language suggests that it is the party that has an associational interest in deciding who may participate in its activities. Indeed, the opinion suggests that a party's right to associate may even protect a more generalized right of group self-governance. *Id.* at 490–91, 95 S.Ct. at 549–50.

## D. *State Regulation of Primary Elections*

In crafting an expansive right of political association, the Supreme Court provided the analytical tools needed to reconcile the inevitable tensions among a political party's right to self-determination, an individual's right to participate in primary elections, and the state's interest in regulating such elections. These competing rights and interests present three potential challenges: First, independent voters may challenge a state-mandated closed primary, claiming that they have a right to vote in that primary election. In addition, a political party may challenge a state-mandated open primary on the grounds that it includes voters lacking a right to participate in the primary election. Finally, there exists the situation presented by the instant appeal: A political party may challenge a state-mandated closed primary, claiming the state regulations prohibit individuals

with whom the party members wish to associate from participating in the primary. To date, courts have addressed only the first two of these challenges. *See generally*, Note, "Primary Elections and the Collective Right of Freedom of Association," 94 Yale L.J. 117 (1984).

The first category of challenge was raised in *Nader v. Schaffer*, 417 F.Supp. 837 (D.Conn.), *aff'd mem.*, 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976). There, the United States District Court for the District of Connecticut upheld the constitutionality of section 9–431 of the Connecticut General Statutes against a challenge by unaffiliated voters who sought to participate in the Republican Party primaries against party wishes.[23]

▪ Because denying an individual the opportunity to vote for a candidate in a primary does not infringe his right of association, *see Rosario v. Rockefeller, supra,* the court subjected section 9–431 to a less than strict level of scrutiny. The court in *Nader* held that the state had a legitimate interest in protecting party members from any intrusion into their "associational rights," *Nader, supra,* 417 F.Supp. at 846–47, including the right of candidate selection, by those with adverse political principles. In so concluding, the court implicitly recognized that associational rights attach to the political party in its candidate selection process, but not to the independent voter excluded from the primary. *See also Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 14, 102 S.Ct. 2194, 2202, 72 L.Ed.2d 628 (1982) (political party not required to include nonmembers in procedure to select replacement for deceased commonwealth legislator).

This theory of collective associational rights also explains the Supreme Court's decision in *Democratic Party of the United States v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), which presented the second type of challenge to state regulation of primary elections. There, the issue before the Court was whether Wisconsin could constitutionally compel the national Democratic Party to seat at its national convention a delegation chosen in a manner that expressly violated the party's rules. The rules of the national Democratic Party permit only those individuals who are willing to affiliate publicly with the Democratic Party to participate in the process of selecting delegates to the Party's national convention. The Wisconsin election laws, however, allow voters to participate in its Democratic presidential candidate preference primary without regard to party affiliation and without requiring a public declaration of party preference.

Relying on the associational rights possessed by a political party and its adherents, the Court reasoned that freedom of association "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party, supra,* 450 U.S. at 122, 101 S.Ct. at 1019. Because the members of the Democratic Party formulated rules defining their associational rights, Wisconsin could compel the Democratic Party to seat a delegation in a manner that violated the Party's rules only if such a statute were supported by a compelling interest. After examining Wisconsin's asserted interests in preserving the overall integrity of the electoral process, increasing voter participation in primaries and preventing harassment of voters, the Court concluded that these claims were insufficient to justify the state's "substantial intrusion into the associational freedom of members of the National Party." *Id.* at 126, 101 S.Ct. at 1021 (footnote omitted).

In discussing the nature of this intrusion, the Court noted that "the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions— thus impairing the party's essential functions." *Id.* at 122, 101 S.Ct. at 1019. Of

---

**23.** At the time, the Republican Party rules did not permit unaffiliated voters to vote in primary elections.

even greater significance, the Court reinforced the unstated principle that "the stringency, and wisdom, of membership requirements is for the association and its members to decide." *Id.* at 123 n. 25, 101 S.Ct. at 1020 n. 25. After all, "a State ... may not constitutionally substitute its own judgment for that of the Party." *Id.* at 123–24, 101 S.Ct. at 1019–20; *see also Ripon Society, Inc. v. National Republican Party*, 525 F.2d 567, 585 (D.C.Cir.1975) (*en banc*) ("[A] party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution"), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

■ Manifest in the Court's decisions in the area of political association, then, is the principle that absent a compelling interest, a state may not interfere with the associational rights enjoyed by political parties and their adherents. Among these rights is that of a political party to choose its own structure, select its own standard bearers, and formulate its own platform—all free from the intrusion of state regulation. *See Democratic Party, supra.* This principle extends to party affairs in general and to primary elections in particular.

## IV. DISCUSSION

Mindful of these tenets, we turn now to the precise issue raised by the instant appeal: Whether Section 9–431 of the Connecticut General Statutes substantially interferes with the Republican Party's collective right of political association. Or, phrased in its simplest terms, whether the right to delineate the group of registered voters who may participate in a primary election inheres in the party alone or whether the state may play a substantial role in defining that group.

■ For the reasons set forth below, we believe that, absent compelling interests, the selection of candidates by a political party is a function that properly falls to the party and not the state. Accordingly, we hold that Section 9–431 substantially interferes with the Republican Party's first amendment right to define its structure, shape its policies and engage in effective political association.

### A. *The Nature of the Intrusion*

At first blush, Connecticut's intrusion into the associational rights of the Republican Party is not readily apparent.[24] For, on its face, Section 9–431 merely prohibits voters who are not enrolled in a political party from participating in primary elections. The statute's intrusiveness, however, becomes clear when one realizes that it is expressly at odds with the organizational aims and electoral aspirations of the Republican Party, which explicitly amended its rules to permit unaffiliated voters to vote in certain primary elections.

In essence, then, we are faced with the situation where a statute—enacted by a Democratic controlled state legislature—effectively regulates the structure and candidate selection process of the Republican

**24.** The State emphasizes that unaffiliated voters seeking to participate in the Republican Party's primary may do so merely by registering with the Party one day prior to the election, and urges that Section 9–431 only incidentally burdens the Republican Party's right of political association. This argument is persuasive where independent voters challenge state laws excluding them from participating in primary elections. *See Nader, supra.* In such cases, the ability to comply with the essentially *pro forma* requirement of affiliation is exclusively within the power of the independent voter, and the unaffiliated voter excluded from the primary cannot be deemed to have suffered any infringement of his right to associate.

This reasoning is inapposite where a political party challenges a state law excluding independent voters from participating in its primaries. Although independent voters possess the ready means to overcome the burden on associational rights imposed by a closed primary law, the political party does not. Indeed, there is nothing the Republican Party may do, pursuant to Section 9–431, to permit unaffiliated voters to participate in its primaries. Consequently, the statute's affiliation requirement substantially burdens the associational rights of a party that seeks to broaden its appeal by allowing unaffiliated voters to participate in its candidate selection process.

Party. In and of itself, legislative definition of an association's boundaries may not appear to run afoul of the first amendment. Nevertheless, in light of the intimate relationship between the structure of a political association and the message ultimately transmitted by that group, we believe the inexorable effect of the Connecticut legislation is to alter the Party's message, and thus strike at the very heart of the first amendment. It is to these concerns that we now turn.

■■■ The Supreme Court has recognized that freedom of association serves as a capacious shield according constitutional protection to a variety of specific rights. Among this bundle of associational freedoms is the right of a group of individuals to form a political party for the advancement of partisan political beliefs. *See Cousins v. Wigoda, supra,* 419 U.S. at 487, 95 S.Ct. at 547. Indeed, the "basic function of political parties" is to nominate candidates for the expression of shared political beliefs, *Kusper, supra,* 414 U.S. at 58, 94 S.Ct. at 308. If the right of political association is to retain its vitality, then, a party must remain free to seek compromise among the varied interests of its adherents. Undue state interference with the party primary—including state mandated exclusion of unaffiliated voters—stands to distort the compromise that might have been struck among these varied interests and, therefore, distort the party's choice among competing political beliefs. By prohibiting unaffiliated voters from participating in party primary elections, therefore, the Connecticut legislature has influenced the content of the compromise emerging from those elections.

Traditionally, unaffiliated or independent voters have not parroted the views expressed by the party faithful, but have injected new and innovative ideas into the political marketplace, and challenged the status quo at every juncture. *See* Adamany, "Crossover Voting and the Democratic Party's Reform Rules," 70 Am.Pol.Sci.Rev. 536 (1976). Because candidates for elected office frame their positions largely by reference to what they perceive to be the concerns of the relevant electorate, statutory circumscription of primary eligibility requirements is certain to affect the content of the ultimate message transmitted by that party. Consequently, the right of political association must be deemed to protect the ability of political party members to identify those persons with whom they wish to associate and allow them to play a part in determining the shared ideals of the party. To rule otherwise, would ignore the teachings of the first amendment and countenance state control, albeit indirect, over a political party's ideology.

Collateral to Section 9–431's indirect interference with the Republican Party's formulation of a political message is the statute's diminution of the effectiveness of the association itself. The Supreme Court has held that a political party enjoys the right to determine the most effective manner in which to associate, select candidates, and maximize its chances of victory in the general election. *See Kusper v. Pontikes, supra,* 414 U.S. at 58, 94 S.Ct. at 308; *Williams v. Rhodes, supra,* 393 U.S. at 30, 89 S.Ct. at 10. After all, electoral success— whether as a means or as an end—is the raison d'etre of every political party. *See Storer v. Brown,* 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974).

The Republican Party in Connecticut, however, has been disappointed repeatedly in its quest for electoral success. Admittedly, the principal reason for these failures is the existence of fifty percent more registered Democrats than Republicans in Connecticut. The Republican Party has sought to increase the likelihood that candidates with a broader base of popular support will emerge from its primaries—that is, to maximize the effectiveness of its association—by amending its rules to allow unaffiliated voters to participate in selected primaries. The legislative branch, however, has thwarted the Party's efforts to reap the fruits of an expanded association and, in so doing, has substantially interfered with the Republican Party's constitutionally protected right, *see Williams v.*

*Rhodes, supra,* 393 U.S. at 30–31, 89 S.Ct. at 10–11.

In analyzing the maze of legislative motive and political effect, we cannot ignore the fact that the Democratic Party, which controls the state legislature, may have exploited its position to structure the electoral process in such a way as to entrench itself in power and immunize itself against successful attack by the Republican Party.[25] We are particularly wary of efforts by government officials to control the very electoral system that serves as the primary check on their power. Indeed, few concepts are so antithetical to the notion of representative democracy as that of a temporary majority entrenching itself by manipulating the system through which the voters, in theory, may register their dissatisfaction by choosing new leadership. In this case, there exists at least the spectre of such entrenchment. Every attempt by the Republican Party to improve its chances for electoral success—in a sense to enhance the competitiveness of the two-party system in Connecticut—was thwarted by Democrats in both houses of the state legislature, who voted unanimously against legislation to allow implementation of the Party Rule. Moreover, on June 28, 1985, the Democratic Governor of Connecticut upheld his promise to veto any legislation that would allow the Republican Party to implement its rule. As a result of these developments, we are constrained to conclude that, to some extent, the State of Connecticut has stifled and inhibited robust political debate, placed obstacles in the path of the Republican Party's pursuit of elected offices and new adherents, and thereby minimized the accountability of elected officials to their constituents.

Accordingly, we hold that Section 9–431 substantially interferes with the Republican Party's first amendment right to define its associational boundaries, determine the content of its message, and engage in effective political association. As such, the statute must be subjected to strict judicial scrutiny.

**B.** *The State's Defense of Its Regulation*

A state regulation that substantially burdens first amendment rights of political association may be upheld only if it is necessary to advance compelling state interests and only if it is tailored to advance those interests in the least restrictive manner. *See Roberts v. United States Jaycees, supra,* 104 S.Ct. at 3258; *Democratic Party v. Wisconsin, supra,* 450 U.S. at 124, 101 S.Ct. at 1020; *Cousins v. Wigoda, supra,* 419 U.S. at 489, 95 S.Ct. at 548; *Williams v. Rhodes, supra,* 393 U.S. at 31, 89 S.Ct. at 10; *Unity Party v. Wallace,* 707 F.2d 59, 62 (2d Cir.1983).

The State asserts that its mandated closed primary law is narrowly tailored and is necessary to advance compelling state interests—preventing raiding, avoiding voter confusion, promoting a stable two-party system, and preserving the integrity of the electoral process. We address these claims seriatim.

**1.** *Preventing Raiding*

Raiding is a practice "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Rosario v. Rockefeller, supra,* 410 U.S. at 760, 93 S.Ct. at 1251. The State's interest in preventing raiding, though it may be legitimate in certain contexts,[26] is inapposite in the in-

**25.** Apart from the ability to structure the political process in an advantageous manner, incumbents enjoy a variety of other benefits that inure to their electoral advantage. Perhaps most significant among these is the surfeit of press coverage accorded incumbents, particularly in relation to their challengers. *See* C. Tidmarch & B. Karp, "The Missing Beat: Press Coverage of Congressional Elections," *Congress & the Presidency* 47, 54–55 (Spring 1983).

**26.** The ability of a party or a group of persons to organize an effective raid in an open primary "has never been conclusively proven by survey research." *Openness, Participation and Party Building Reforms for a Stronger Democratic Party* 68 (1978) (Winograd Commission); *see also* A. Ranney, "Turnout and Representation in Presidential Primary Elections," 66 Am.Pol.Sci. Rev. 21, 35–36 (1972).

stant action. The Party Rule allows only unaffiliated voters to participate in Republican Party primaries; no such invitation has been extended to Democrats or members of other political parties. Moreover, we believe the spectre of Democratic voters severing their party ties *en masse,* and claiming independent status to mount a raid on a Republican Party is effectively eliminated by another section of the Connecticut General Statutes, *see* Conn.Gen. Stat. § 9–59, which provides that a person affiliated with one party may not vote in the primary of another party within six months after leaving his original party.

Finally, the State's professed interest in preventing raiding is belied by its recent enactment of Public Act 84–118, permitting unaffiliated voters to affiliate with a political party until noon on the day immediately prior to the primary election. It would appear anomalous for a state truly concerned with voter raiding to eliminate any obstacle to independent voters determined to disrupt the candidate selection process of a political party.

### 2. *Avoiding Voter Confusion*

■ The second interest articulated by the State in defense of its closed primary law is the need to avoid confusion among voters. The State maintains that, as a necessary concomitant of preferential ballot access, it may ensure that the candidate who wins a party primary accurately represents the views of the party members, and not those of an amorphous group of unaligned voters. The State premises its argument on the assumption that many voters rely on partisan labels as shorthand for particular ideologies, and thus presume that a candidate in the general election running under a party banner espouses the views generally held by party members,[27] *see* N. Nie, S. Verba & J. Petrock, *The Changing American Voter* 47–56 (1976), Martin Van Buren, *Inquiry Into the Origin and Course of Political Parties in the*

*United States* 6, 226 (1867). Arguing that such "reliance" is widespread, the State claims it has an interest in protecting voters from confusion. Even if this interest were deemed legitimate, a state certainly does not have a compelling interest in shielding from confusion those voters who engage in unthinking and Pavlovian reliance on party labels. *Cf. Williams v. Rhodes, supra,* 393 U.S. at 32, 89 S.Ct. at 11. Moreover, the State's position necessarily presumes a duty to define the composition of political parties in such a way as to clarify the political and ideological distinctions between them. In effect, Connecticut professes to have a compelling interest in deciding the ideological slant and bases of support for a political party. Most decidedly, however, it is the prerogative of the political party—and not the state—to determine whether it should be structured as a broad-based, relatively non-ideological organization or as a closely-knit, strongly ideological unit. The mere incantation of a talismanic phrase such as "voter confusion" cannot transform a specious interest into a compelling one.

### 3. *Maintaining the Two-Party System*

The State further claims that its closed primary law maintains party identity, encourages politics of "coalition and accommodation," A. Bickel, *Reform and Continuity,* 21–22 (1971), and is therefore required to preserve a stable two-party system. In framing its argument, the State points to the parade of horribles that would befall democracy if the Party Rule were implemented. Beneath this veneer of hyperbole, we find little substantive support for the State's position. Moreover, the issue is not, as urged by the State, which type of party primary—open or closed—is preferable. Rather, the proper inquiry is whether the State's insistence that the Republican Party adhere to a particular candi-

---

**27.** In general elections, few voters exercise independent judgment beyond the most highly publicized races. The further one moves down the ballot, the more difficult it is for voters to make

selections without relying on the party label. *See* P. David, *Party Strength in the United States* 302–03 (1972).

date selection process is justified by a compelling interest.

We are unable to discern how deviating from the state-mandated closed primary system will breed the splintered parties and unrestrained factionalism feared by the State. Indeed, it would appear that an open primary would achieve precisely the opposite effect, discouraging factionalism by forging a broader coalition of interests within a single political party. *See* Dawson, "Social Development, Party Competition, and Policy," in *The American Party Systems* 208–09 (W. Chambers & W. Burnham eds. 1967).[28] *See also Anderson v. Celebreeze,* 460 U.S. 780 (1983).

By portraying change in the political order as anathema, the State ignores the flux that has traditionally characterized our two-party system.[29] As circumstances change, parties must be free to explore the political requisites of a given period. Whether the course selected by a party leads to success and power or to failure and decline, the first amendment guarantees that the decision be the choice of the party, not the state.

### 4. *Preserving the Integrity of the Electoral Process*

The final interest proffered by the State in defense of its closed primary law is preserving the integrity of the electoral process. Because primary elections are conducted at state expense, and because the state strengthens political parties by conferring preferential general election ballot access upon candidates selected in party primaries, it cannot be gainsaid that a state possesses a strong interest in the operation of its electoral regime.

We can well imagine circumstances in which the integrity of a state's electoral processes is threatened, and where some level of governmental intrusion into the administration of primaries is necessary to protect the state's vital interest in the fair and efficient running of elections. Indeed, states are inevitably and inexorably involved in the mechanics of elections, and this involvement may always be characterized as somewhat "intrusive." Each time a state sets hours during which polls will be open, or designates polling places, or designs a system for absentee balloting, its choice affects the ability of certain persons to associate for political ends. Nevertheless, as these intrusions become more pronounced, and their effects increase, the ill sought to be cured by governmental involvement must become correspondingly greater.

Notwithstanding Connecticut's claim that implementing the Party Rule would render the state's electoral processes unmanageable and grant the Republican Party "a practical veto over state law, and the party [would] become[ ] a law unto itself," Brief for Appellant at p. 45, we find little evidence in the record to support this assertion. Indeed, the State of Connecticut appears more concerned with the Party's ability to change its rules at will than with the specifics of the rule as it has enacted. The thrust of the State's argument is that the Party, if it may enact this rule, may in the future enact any and all rules it wishes. The fear expressed by the State in its brief and voiced at oral argument is that the Republican Party—and, perhaps, every other party—may implement new rules every year, requiring the State to change its electoral procedures constantly. The State further raises the spectre of party rules altered on the eve of election, forcing the State to recalibrate its electoral system on a moment's notice.

---

**28.** The experiences of those states that have adopted open primaries lend support to this conclusion. *See* Hawaii Rev.Stat. § 12–31; Idaho Code §§ 34–402, 34–404, 34–904; Mich. Comp.Laws §§ 168.575, 168.576; Minn.Stat. § 204D.08(4); Mont.Code Ann. § 13–10–301(2); N.D.Cent.Code § 16.1–11–22; Utah Laws § 20–3–19(2); Vt.Stat.Ann.Tit. 17 § 2363; Wisc.Stat. §§ 5.37, 6.80(e).

**29.** "The principle is plain that there can be no interference with freedom of expression on the general ground that it will lead to social change, or change at the wrong rate, or in the wrong direction." T. Emerson, *The System of Freedom of Expression* 47 (1970).

Indeed, the concerns of the State appear to be sincerely held. And, as we have noted, we can imagine circumstances where a state might in fact be forced to spend vast sums of money and endure considerable inconvenience to effect the whims of private political associations. But we stress that, in this case, the State's fears are just that—fears, and pure speculation will not support as massive a governmental intrusion into the affairs of a political association as that worked by Section 9–431.

As Justice Black noted in *Williams v. Rhodes, supra,* 393 U.S. at 33, 89 S.Ct. at 12, "No ['theoretically imaginable'] danger can justify the ... crippling impact on the basic constitutional rights involved in this case." These words are particularly apt in the instant action.

Even if we were to assume, *arguendo,* that the State's compelling interest in preserving the integrity and stability of its electoral process was not overcome by the hypothetical nature of the potential abuses, we believe the State's interest may be justified by means far less drastic than its mandated closed primary. If, for example, Connecticut's concern truly lies with the constant changing of party rules, the State could simply impose a limit on the frequency with which party rules could be changed. Or, if the State's fears were caused by the spectre of last-minute changes in the manner of selecting candidates, the legislature could properly impose restrictions on the ability of a party to change its rules for a specified period prior to an election. Unlike Section 9–431, such legislation would be appropriately tailored to achieve the State's interests, while simultaneously minimizing the intrusion into a political party's first amendment right of association.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court, enjoining the Secretary of the State from enforcing Section 9–431 of the Connecticut General Statutes.

OAKES, Circuit Judge (concurring):

While the issues are many and complex, the answer in this case seems to me evident. For the reasons perhaps best stated in the amici curiae brief of the political scientists (James MacGregor Burns, Barbara Burrell, William Crotty, Roman B. Hedges, John S. Jackson III) and in the Note, *Primary Elections and the Collective Right of Freedom of Association,* 94 Yale L.J. 117 (1984), I concur in affirming the judgment. Both broadly inclusive and narrowly exclusive models of political organizations were anticipated (and are or should be protected) in light of the purposes of the First Amendment, *see The Federalist* Nos. 10, 47 (J. Madison); G. Wood, *The Creation of the American Republic, 1776–1787,* 18–28, 189–96, 319–28 (1969). And a political party is entitled, *Democratic Party v. Wisconsin ex rel. La Follette,* 450 U.S. 107, 121–22, 101 S.Ct. 1010, 1018–19, 67 L.Ed.2d 82 (1981); *Cousins v. Wigoda,* 419 U.S. 477, 487–88, 95 S.Ct. 541, 547–48, 42 L.Ed.2d 595 (1975), to make the choice in the first instance as to which model it wishes to follow, *see Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), provided of course that it does not engage in invidious discrimination, directly or deviously. *Cox v. Louisiana,* 379 U.S. 536, 557–58, 85 S.Ct. 453, 465–66, 13 L.Ed.2d 471 (1965); *NAACP v. Alabama,* 357 U.S. 449, 462–63, 78 S.Ct. 1163, 1171–72, 2 L.Ed.2d 1488 (1958). No compelling contrary state interest has been shown, as developed in Judge Kaufman's opinion.

The "problem" emphasized in the State of Connecticut's brief (pp. 7–14) that the Republican Party Rule provides for different voter qualifications for Congress than it does for the state legislature seems to me to be specious and I would meet it more squarely than does that opinion. All that article 1, section 2 means, it seems to me, is that anyone who is permitted to vote for the most numerous branch of the state legislature has to be permitted to vote for Congress and the Seventeenth Amendment

applies the same rule to the election of senators. This conclusion is buttressed, first, by the constitutional history of article 1, section 2. As one commentator puts it:

> The difficulty confronting the Convention here lay in the fact that every state had adopted different qualifications for its electors. Each state was a law unto itself. The framers of the constitution, therefore, saw that the adoption of a uniform qualification for federal voting was impossible, as it would embarrass and inconvenience all the states, no matter what qualifications might be adopted.... Should an entirely new qualification be adopted, it would perplex and trouble all, and cause irritation by excluding some from voting for members of Congress, who would be able to vote for members of the state legislatures, or vice versa. The convention, therefore, wisely adopted the qualifications fixed by the states in their constitutions and laws for the election "of the most numerous branch of the State Legislature."

1 D. Hutchinson, *The Foundations of the Constitution* 31 (1975) (footnotes omitted). It is true that the precise compromise adopted was by the Committee of Detail, which did not in the fashion of today's congressional committees issue a report, but the Founding Fathers surely appreciated, as Pennsylvania's James Wilson put it, that "[i]t would be very hard & disagreeable for the same persons at the same time, to vote for representatives in the State Legislature and to be excluded from a vote for those in the Natl. Legislature." Madison, *Notes of Debates in the Convention of 1787* 401 (A. Koch ed. 1966). Connecticut's Oliver Elseworth, for example, warned that "people will not readily subscribe to the Natl. Constitution if it should subject them to be disenfranchised." *Id.* Benjamin Franklin and South Carolina's John Rutledge spoke against "narrow[ing]" or "restraining" the right of suffrage. *Id.* at 404, 405. While the debate centered on the question whether the right of suffrage would be restrained to freeholders, the sentiments expressed demonstrate that broadening the right to suffrage rather than narrowing it was the Fathers' aim.

Secondly, there was a general concern that

> [t]he definition of the right of suffrage is very justly regarded as a fundamental article of republican government. It was incumbent on the convention, therefore, to define and establish this right in the Constitution. To have left it open for the occasional regulation of the Congress would have been improper for the reason just mentioned. To have submitted it to the legislative discretion of the States would have been improper for the same reason; *and for the additional reason that it would have rendered too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone.* To have reduced the different qualifications in the different States to one uniform rule would probably have been as dissatisfactory to some of the States as it would have been difficult to the convention. The provision made by the convention appears, therefore, to be the best that lay within their option. It must be satisfactory to every State, because it is *comfortable* to the standard already established, or which may be established, by the State itself. It will be *safe to the United States because,* being fixed by the State constitutions, it is not alterable by the State governments, and *it cannot be feared that the people of the States will alter this part of their constitutions in such a manner as to abridge the rights secured to them by the federal Constitution.*

*The Federalist* No. 52, at 326 (J. Madison) (C. Rossiter ed. 1961) (emphasis added). To be "comfortable to" is not to be identical with. The use of qualifications of the most numerous branch of the state legislatures was, then, to serve as a buffer against a state's imposing greater qualifications upon the voters for the House of Representatives than upon its own voters for the corresponding branch of the state legislature. As Madison put it in *The Federalist* No. 57,

Who are to be the electors of the federal representatives? Not the rich, more than the poor; not the learned, more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune. The electors are to be the great body of the people of the United States. They are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State.

*Id.* at 351.

Thus, as Professor Corwin has stated, "It was the original constitutional scheme to vest the determination of qualifications for electors in congressional elections solely in the discretion of the States, save only for the express requirement that the States could prescribe no qualifications other than those provided for voters for the more numerous branch of the legislature." Congressional Research Service, Library of Congress, *The Constitution of the United States of America Analysis and Interpretation* 99–100 (1973). It does not take away from this argument that the states' power to prescribe those qualifications has been further limited, not only by judicial decision, *e.g., Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), and by four constitutional amendments (XV (race); XIX (sex); XXIV (payment of poll tax); XXVI (age)), but by congressional action under the Fourteenth Amendment, section 5, *e.g.,* 42 U.S.C. § 1973b(e), upheld in *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

And while I do not make much out of the argument, it is true, of course, that there was no such thing as a party primary when article 1, section 2, was written. There was, however, by the time the Seventeenth Amendment (setting forth as qualifications for voters for Senators the same as for voters for the House) was adopted (1913); yet the Amendment, though proposed by the Congress, does not speak to primary elections as Congress could and did do when it felt the necessity, *see* U.S. Const. amend. XXIV.

Accordingly, I concur in the judgment of affirmance.